**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CESAR URIEL RODRIGUEZ MARTINEZ,**<br><br>**Defendant.** | **Case No. 26-CR-00261-SEH** |

## OPINION AND ORDER

Before the Court is Defendant Cesar Uriel Rodriguez Martinez's motion to suppress evidence. [ECF No. 24]. Upon consideration of all the parties' filings, the record, and the evidence provided during the evidentiary hearing, the Court denies Defendant's motion.

## I. Relevant Standards

On a motion to suppress, it is the Court's obligation to assess witness credibility and the weight of the evidence. *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (citation omitted). The burden of proof at a suppression hearing is generally a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Shrum*, 908 F.3d 1219, 1229 n.7 (10th Cir. 2018) (citation omitted). In the Fourth Amendment context, "[t]he defendant has the burden of showing the Fourth

Amendment was implicated, … while the government has the burden of proving its warrantless actions were justified." *Goebel*, 959 F.3d at 1265. In the context of a *Miranda* violation, "[t]he defendant bears the initial burden of establishing they were subject to custodial interrogation." *United States v. Martinez*, 122 F.4th 389, 405 (10th Cir. 2024). "Once the defendant establishes a prima facie case of custodial interrogation, the burden shifts to the Government to establish by a preponderance of the evidence that any waiver of the defendant's Fifth Amendment privilege comported with the requirements of *Miranda* and its progeny." *Id.*

## II. Background[1]

This case began with a 911 caller alerting authorities that suspects in a maroon or reddish Tahoe with black chrome rims rolled down the window to flash a gun and tell the caller's aunt "what y'all on?" or "y'all got a problem?" The caller said the suspects sounded like two "Mexicans." And while the caller wished to remain anonymous, he told the 911 dispatcher his first name. The caller did not wish to file a police report. Rather, he just wanted officers to conduct a neighborhood routine check.

---

[1] The Court makes its findings of fact from the parties' briefs, the exhibits attached thereto (including the 911 call audio, Officer Marshall's body-worn camera, Officer Marshall's police report, and the transcript of the preliminary hearing), and the evidence received during the evidentiary hearing, including the witness testimony and the immigration questionnaire and booking sheet admitted as Defendant's exhibit one.

Shortly after the 911 call, Tulsa Police Department Officer Adam Marshall arrived on the scene about a block away, just around the corner from the address that the 911 caller provided. Marshall approached a reddish or maroon SUV that appeared to be a Chevrolet Tahoe with chrome wheels, which was consistent with the description provided by the 911 caller. As Marshall approached the SUV, Defendant Cesar Uriel Rodriguez Martinez began to exit the vehicle from the front passenger door. Marshall ordered Defendant to stay in the car. Defendant immediately started to ask Marshall questions about what was going on. Marshall then quickly asked Defendant if there were any weapons in the vehicle, and Defendant confirmed that he had a gun. Marshall then ordered Defendant to exit the vehicle. Marshall told Defendant he was not being arrested, but when he patted Defendant down, Defendant spontaneously said he had marijuana on him. Marshall recovered and unloaded the gun and put Defendant in handcuffs. At this point, two other officers were with Marshall at the scene.

Marshall then searched the vehicle, inspected the gun, and ran a records check of some kind on a computer. Marshall remarked: “I can’t even find this guy.” After the records check, Marshall walked back over to where Defendant was standing with another officer outside the rear passenger door of a police car. Marshall searched through Defendant’s pants and told Defendant he was going to jail for unlawful possession of a firearm. A nearby officer explained

that Defendant could not have marijuana and a firearm together. Officers then collected Defendant's personal belongings and put him in the back of a police car.

As Marshall began to drive Defendant to the jail, Defendant asked Marshall for his name. Based on the context of the surrounding conversation recorded by Marshall's body-worn camera, it sounds like Defendant then asked Marshall if he was Hispanic, to which Marshall responded "no." Defendant then asked "what are you?" to which Marshall responded "Native American, Cherokee." Defendant continued to talk and then asked Marshall about getting his gun back. Marshall and Defendant talked a bit more on the drive to the jail. In the Court's review of the evidence, Defendant is the one who initiated most, if not all, of the conversation.

After Marshall and Defendant arrived at the jail, Marshall kept Defendant in handcuffs and grabbed several forms from labeled file organizers that were mounted on the wall of the intake room. Marshall first asked Defendant whether he was native "because we ask everybody," and confirmed that Defendant is Hispanic. Marshall then asked Defendant where he was born, but Defendant's response is inaudible. Although Defendant's response is inaudible, the booking sheet (which Defendant admitted as an exhibit during the evidentiary hearing without objection) lists Defendant's place of birth as Mexico. Marshall continued to collect other information,

including biographical and background information to complete his forms. After completing his forms, Marshall led Defendant to a secondary booking area.

Defendant was then interviewed by Detention Officer Tanner Perry. Perry is a designated immigration officer with the Tulsa County Sheriff's Office. Perry spent a month training with the Department of Homeland Security for his position. From Perry's point of view, he does not take part in any criminal investigations. He only becomes involved in interviewing arrestees when they are identified as being born outside the United States. Perry takes fingerprints of each individual he interviews, and he completes a questionnaire with them. Perry ran an immigration records check on Defendant, but the search did not return any results. The questionnaire seeks the following information and asks these questions:

- Date form prepared
- Name
- Date of birth
- Place of birth
- Do you have documents to be in the U.S. legally?
- If you have documents, what kind?
- When did you last enter the United States?
- How did you cross the border? Legally or illegally?
- Where did you cross the border of the U.S.?[2]
- What are your parent's names?

---

[2] The form also contains an additional, untranslated question that reads: "Cerca de qual ciudad grande en Los Estados Unidos?" This question has not been translated for the Court, and Perry testified that he read the questions to Defendant in English, so it is unclear from the record that this additional question was asked.

- Have you ever served in the United States Military?
- U.S. Address.

Perry asks arrestees these questions for administrative immigration purposes, not for the purpose of pursuing a criminal investigation. Nor does he contemplate a criminal proceeding while asking these questions. Nevertheless, Perry had the booking sheet with him during the interview, which notes one of the reasons for arrest as possession of a firearm while intoxicated. While Perry interviewed Defendant, he was not in handcuffs, and he did not appear to be intoxicated but was alert and oriented.

Upon completion of immigration interviews, Perry puts the questionnaires in a filing cabinet. The questionnaires are eventually transmitted to Immigration and Customs Enforcement. After Perry finished interviewing Defendant, a civil administrative detainer was imposed on him, and an administrative warrant was issued.

Defendant was not provided a *Miranda* warning at any point in his interaction with law enforcement related to his arrest on April 30th, 2026.

## III. <u>Discussion</u>

Defendant raises two primary arguments: he was unlawfully seized in violation of the Fourth Amendment, and his statements were taken in violation of the Fifth Amendment. With respect to the Fourth Amendment issue, Defendant sets forth several arguments: (1) the 911 call did not

describe a crime that would have given law enforcement reasonable suspicion; (2) the 911 call was not reliable and did not tie Defendant to wrongdoing; and (3) everything that followed should be suppressed as fruit of an unlawful seizure. And as for the Fifth Amendment issue, Defendant advances a few additional arguments: (1) Defendant's statements at the scene and in transport while handcuffed and under arrest should be suppressed because they were made without a *Miranda* warning; (2) Defendant's statements during a jail immigration interview were part of a custodial interrogation without a *Miranda* warning; and (3) Defendant's statements were not voluntary because they were made in the "early-morning hours, while officers observed that he appeared intoxicated, and without any advisement of rights." [ECF No. 24 at 9].

***A. The Fourth Amendment***

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. This typically requires law enforcement officers to have probable cause before conducting a search or seizure. But there is an exception to this requirement for brief investigatory stops, which are more commonly known

as *Terry* stops. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Court "created a limited exception to" the prior general rule that "any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause." *Florida v. Royer*, 460 U.S. 491, 498 (1983). The Court held in *Terry* that "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Id.*

Defendant argues that he was seized upon Officer Marshall's initial contact with him when Marshall ordered Defendant to stay in the car. [ECF No. 24 at 4–5]. The government appears to agree that the initial encounter between Marshall and Defendant is governed by *Terry*. [ECF No. 26 at 10] (referring to "Ofc. Marshall's *Terry* stop."). Therefore, the question for the Court is whether Marshall had "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Huerta*, 166 F.4th 866, 873 (10th Cir. 2025).

Plaintiff first takes issue with the 911 call that caused Officer Marshall to respond to the scene. "A tip to the police, like a 911 call, can 'justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur.'" *United States v. Daniels*, 101 F.4th 770, 777 (10th Cir. 2024) (citation

omitted). The reliability of such a tip is analyzed using several factors, none of which is dispositive alone:

> (1) [W]hether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*Id.* (citation omitted).

Nearly all the factors support the reliability of the call. Although the caller requested anonymity, he was not truly anonymous because he gave the dispatcher his first name. The caller provided contemporaneous information because he called within a few minutes of the incident, but his knowledge was not firsthand because he was reporting what his aunt told him. The caller provided detailed information about the events because he was able to identify a location and specific identifying information about the vehicle that the suspects were in. The informant's stated motivation supports reliability because he said he did not want to file a police report. Rather, the caller asked for a routine neighborhood check. Officers were also able to corroborate the information provided by the caller because the vehicle was consistent with the description provided, and it was close to the address the caller

provided. Based on these factors and upon considering the totality of the circumstances, the Court finds the 911 call sufficiently reliable.

Defendant argues that the 911 call did not describe a crime because "[t]he caller reported the presence of guns only, and when asked, specifically denied that any gun was pointed." [ECF No. 24 at 5]. Although Defendant cites criminal statutes that require a person to point a gun, specifically 21 O.S. §§ 1279, 1289.16, Defendant misses the mark. Oklahoma law makes it a crime to threaten to perform an act of violence. 21 O.S. § 1378(B); *see also Hall v. Bivens*, No. 24-CV-404-JFJ, 2025 WL 1211180, at *3–4 (N.D. Okla. Apr. 25, 2025).

The 911 caller in this case did not describe mere innocuous conduct that falls well within the Second Amendment's protections. *See Daniels*, 101 F.4th at 778. Rather, the statements reported by the 911 caller must be taken into context. "According to the Oklahoma Uniform Jury Instructions (Criminal) for § 1378(B), the elements for proving this crime are: (1) willfully; (2) threatening; (3) to perform an act of violence; and (4) involving/(intended to involve) (serious bodily harm to)/(the death of) another person." *Hall*, 2025 WL 1211180, at *4 (citing Vernon's Okla. Forms 2d, OUJI-CR 2-24). The 911 caller reported that someone in the vehicle "flashed" a gun and asked "what y'all on?" or "y'all got a problem?" The Court finds these to be willful, threatening statements. Combined with the caller's report that the suspect

"flashed" a gun while making these statements, the Court finds this to be an apparent insinuation by the suspect that they intended to shoot the caller's aunt, which would be an act of violence that would involve serious bodily harm or death.

Of course, those statements would not necessarily give a law enforcement officer reasonable suspicion to stop just anyone in the vicinity of the alleged crime. But officers found a vehicle nearby that closely resembled the description provided by the caller. Therefore, Marshall had reasonable suspicion to order the Defendant to stay inside and briefly detain him for a *Terry* stop. Because Marshall had reasonable suspicion to conduct a *Terry* stop and seize Defendant for that purpose, there is no reason to suppress the evidence that followed. Defendant's motion is denied as to the Fourth Amendment issues.

***B. The Fifth Amendment***

The Fifth Amendment prohibits any person from being "compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. As a part of the right against self-incrimination, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). But "*Miranda* warnings are

required only at the moment the suspect is in custody and the questioning meets the legal definition of interrogation." *United States v. Wagner*, 951 F.3d 1232, 1250 (10th Cir. 2020) (citation, brackets, and internal quotation marks omitted).

***i. Custody***

"An interrogation is custodial when, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (citation and internal quotation marks omitted). "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *United States v. Jones*, 523 F.3d 1235, 1240 (quotation omitted). Courts should consider: "(1) the extent ... the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will, (2) the nature of the questioning, (3) the extent police officers dominate the encounter," and "(4) the release of the suspect at the end of the questioning." *Wagner*, 951 F.3d at 1250 (cleaned up). "Officers may 'dominate' an encounter by displaying a weapon, making physical contact, isolating the suspect in a police-controlled environment, or appearing in overwhelming numbers." *Id.* (citation omitted).

Only when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest'" is he "in custody" for *Miranda* purposes.

*Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). An officer's subjective plan "has no bearing on the question [of] whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 421–22 (citations omitted).

There is no evidence in the record that Defendant was ever informed that he was free to refrain from answering questions or to end any questioning. The nature of the questioning was not particularly intense, hostile, or otherwise intentionally designed in such a way to elicit information from Defendant. Officers responded to a neighborhood street where they found Defendant, and he was placed in handcuffs quickly after officers arrived. Marshall then transported Defendant to jail and put him through booking procedures with reasonable speed and efficiency. Several officers responded to the scene in a show of force, and law enforcement quickly took charge of the situation. Defendant was in handcuffs at least up to the point that he spoke with Perry, and he was physically under law enforcement's control throughout the encounter. Defendant was not released after the encounter. Given these factors, the Court finds that Defendant was in "custody" for purposes of *Miranda* as soon as officers arrived on scene through the entire booking and immigration interview process.

***ii. Interrogation***

"Interrogation 'refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Sanchez*, 13 F.4th 1063, 1074 (10th Cir. 2021) (citation omitted). "Even so, 'words or actions on the part of the police normally attendant to arrest and custody are not interrogation.'" *Id.* (citation omitted). The focus is not just on an officer's subjective intent, but rather the objective "perceptions of a reasonable person in the suspect's position." *Id.* (citation omitted); *see also Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."). And although a person's responses to questions from a custodial interrogation may be suppressed without a proper *Miranda* warning, spontaneous statements are not subject to *Miranda*'s protections. *United States v. Pettigrew*, 468 F.3d 626, 633–34 (10th Cir. 2006) (citations omitted).

***iii. Defendant was not subjected to a custodial interrogation that would require a Miranda warning.***

Defendant points to three main points on this front: (1) the statements he made at the scene when he was detained and while handcuffed in transport; (2) the jail immigration interview; and (3) the voluntariness of his statements

with respect to the early morning hours, his intoxication, and the lack of *Miranda* warnings.

Statements at the Scene and in Transport

The only specific statements Defendant points to or cites are: (1) Defendant's response to the officer's question about whether a weapon was in the car; and (2) Defendant's questions to law enforcement about whether he would get his firearm back. Neither of these statements are subject to exclusion under *Miranda*.

The Tenth Circuit has adopted a public safety exception to *Miranda*, which allows an officer to question someone in custody when the question "arise[s] out of 'an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" *United States v. DeJear*, 552 F.3d 1196, 1199 (10th Cir. 2009) (citation omitted). An officer has a reasonable belief about danger when he or she believes: "(1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *Id.* (citation omitted). Marshall approached Defendant's vehicle while investigating a 911 call that described someone in a similar vehicle making threats while displaying a gun. That objectively shows Marshall reasonably believed that the situation could be dangerous, that someone in the vehicle may have a weapon, and that someone could use that weapon to

inflict harm. The Court will not suppress Defendant's response to Marshall's question about a weapon being in the vehicle because these facts place this interaction within the public safety exception to *Miranda*.

With respect to Defendant's question to Marshall about getting his gun back, Defendant is the one who initiated that question while he was in Marshall's police vehicle. In the Court's review of the evidence, Marshall did not say or do anything that would have made it "reasonably likely to elicit an incriminating response from'" Defendant. *United States v. Sanchez*, 13 F.4th 1063, 1074 (10th Cir. 2021). Defendant's question was spontaneous and unprompted, and the Court will not suppress it under *Miranda*.

Rather than citing to any specific, additional statements, Defendant broadly asserts that "[s]tatements taken in those circumstances," (*i.e.* while handcuffed and under arrest) "without *Miranda* warnings should be suppressed." [ECF No. 24 at 8]. But as noted above, not all statements made while in custody are subject to suppression under *Miranda*. Therefore, the Court will not categorically suppress all of Defendant's statements at the scene and while in transport as he requests. However, the Court's order is without prejudice to Defendant raising an objection at trial to specific statements that should be suppressed under *Miranda*.

The Jail Immigration Interview[3]

In general, "questions as to date and place of birth are normal questions attendant to arrest and custody and do not require a *Miranda* warning." *United States v. Lara-Garcia*, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007). But the context surrounding such a question or the purpose for which it was asked may inform whether a *Miranda* warning is required. *United States v. Arrazola-Vanega*, No. 14–cr–00435–RBJ, 2015 WL 3562168, at *6–7 (D. Colo. May 21, 2015) (citing *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993)). For example, questions may be asked as a part of routine booking procedures, and those questions do not require a *Miranda* warning. *Id.; see also Holland v. Farris*, No. 19-CV-0246-GKF-CDL, 2022 WL 3569005, at *8 (N.D. Okla. Aug. 18, 2022). But "where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of *Miranda*." *Parra*, 2 F.3d at 1068. This can be challenging in the immigration context because questions about immigration can relate to either civil or criminal processes. *See generally Arrazola-Vanega*, 2015 WL 3562168, at *6–9. But at the end of the day, the relevant question is whether there was a warning

[3] Although the Court finds that Defendant was in custody for the reasons explained above, the Court further notes that at the evidentiary hearing, the Government specifically conceded that Defendant was in custody during the immigration interview with Detention Officer Perry.

before ""words or actions … that the police *should know* are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (emphasis added).

The facts in this case show that when Perry asked Defendant the questions on the immigration form while at the jail, he was asking those questions for civil enforcement purposes, not to conduct any criminal investigation or to elicit any incriminating responses. And what is more, there is nothing about the particular facts in this case that made Perry ask Defendant these particular questions. Rather, the questions Perry asked came from a form that he uses to ask questions of all arrestees who were born outside the United States. Two cases are particularly helpful on this point. First, as the Tenth Circuit noted in *United States v. Alvarado-Lopez*, the expectation about whether a question will furnish an incriminating response "is not present [when] officers were not even considering criminal charges against" the defendant. *See* 991 F.2d 806, *2 (10th Cir. 1993) (Table, Unpublished). Although the Tenth Circuit's holding in *Alvarado-Lopez* was focused on the issue of custody, the surrounding context of questioning about immigration issues is relevant to determining whether a *Miranda* warning should have been given.

Second, a district court in Colorado was presented with a similar circumstance in *United States v. Arrazola-Vanega*, No. 14–cr–00435–RBJ,

2015 WL 3562168 (D. Colo. May 21, 2015). Although not binding on this Court, the decision in the *Arrazola-Vanega* case is persuasive in that the officer in that case was also not asking questions "for the purposes of a criminal investigation." *Id.* at *8. Of course, a defendant's answers could have incriminating effects later on, but questions asked for civil enforcement and background purposes do not require a *Miranda* warning. *Id.* at *6–9. The Court finds that the majority[4] of the questions asked on the form fall into the category of civil, administrative, or routine booking or biographical questions that do not transform the questions into an interrogation for *Miranda* purposes. Therefore, Defendant has not established a *prima facie* case of custodial interrogation, and the Court will not suppress Defendant's answers to Perry's questions.

<u>Voluntariness</u>

Defendant argues that his statements were involuntary because he was questioned "in custody in the early-morning hours, was questioned in custody

[4] At the hearing, Plaintiff identified two questions on the questionnaire that presented the closest question: (1) the question asking Defendant "How did you cross the border? Legally or illegally?"; and (2) "Where did you cross the border of the U.S.?" But Defendant's answers to these questions are either not relevant to the offense Defendant is charged with under Fed. R. Evid. 401, 402, or they are excludable under Fed. R. Evid. 403 as being substantially more unfairly prejudicial than probative. For those reasons, the Court will exclude those questions and their answers. That means the Court does not need to reach the *Miranda* issue as to these two questions. However, the Court notes its concern that these questions are at least arguably relevant to a violation of 8 U.S.C. § 1325(a).

in the early-morning hours, while officers observed that he appeared intoxicated, and without any advisement of rights." [ECF No. 24 at 9]. Defendant is correct that he was arrested in the early-morning hours. But in the Court's view of the evidence, he was alert, responsive, and aware of what was happening at the scene, in transport, and at the jail. Nor did Defendant appear so intoxicated that his statements were involuntary. "Drug use will only render a confession unknowing if it rises 'to the level of substantial impairment.'" *Coddington v. Sharp*, 959 F.3d 947, 959 (10th Cir. 2020). Again, Defendant appeared alert and responsive, and he provided clear and appropriate answers to questions without any apparent difficulty. The Court will not suppress Defendant's statements as involuntary because of the time of day or his intoxication.

Defendant again asserts that Defendant's statements were involuntary because they were made "without any advisement of rights." [ECF No. 24 at 9]. As noted above, statements are not automatically inadmissible because they were made without a *Miranda* warning, so the Court will not suppress all of Defendant's statements *Miranda* warning. However, the Court's order is without prejudice to Defendant raising an objection at trial to specific statements that should be suppressed under *Miranda*.

## IV. Conclusion

For the reasons set forth above, Defendant's motion to suppress, [ECF No. 24], is DENIED.

DATED this 20th day of November, 2026.

Sara Hill

Sara E. Hill
UNITED STATES DISTRICT JUDGE